**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ELISA J. YOCHIM** | ) | |
| | ) | **Civil Action No.** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge:** |
| | ) | |
| **JULIÁN CASTRO,** | ) | |
| **Secretary,** | ) | **Jury Trial Demanded** |
| **U.S. Dept. of Housing and Urban Development** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, by and through her undersigned attorneys, states as follows as her Complaint:

**PRELIMINARY STATEMENT**

1.)     This is a case by Plaintiff, Elisa J. Yochim, who until her retirement in May of 2015 was a highly accomplished GS-14 Trial Attorney with the Department of Housing and Urban Development ("HUD") in its Chicago Regional Office (Region V).  For over 20 years, Ms. Yochim received sterling performance appraisals and served as the sole attorney responsible for procurement law and procurement litigation within Region V, and as the primary attorney handling ethics and standards of conduct issues in the Region.

2.)     Ms. Yochim's claims arise under Title VII of the Civil Rights Act, as amended, 42 U.S.C. §2000e-16, and the Rehabilitation Act of 1973[1], as amended, 29 U.S.C. §§791 et seq., and center around Defendant's repeated denials of Ms. Yochim's requests for reasonable

---

[1] The Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791 et seq., applies the provisions of the Americans with Disabilities Act, 42 U.S.C. §12112, and the ADA Amendments Act of 2008 (ADAAA), 42 U.S.C. §§12102, et seq., as amended, to federal employees, who enjoy the remedies available under Title VII of the Civil Rights Act, 42 U.S.C. §1981a(2).

accommodation ("RA"), its retaliation against her, and its steadfast refusal to engage in the RA interactive process in good faith, despite Ms. Yochim's undisputed medical evidence that she was a qualified individual with a disability.

3.)     From November of 2012 through May of 2015, Defendant denied a series of RA requests by Ms. Yochim that were based on her carpal tunnel syndrome and post-surgical complications of that condition, and her severe bone-on-bone joint pain from osteoarthritis, which she was unable to treat with medication.

4.)     Throughout this entire period, Ms. Yochim was fully capable of performing all of the essential duties of her position by modestly expanding her existing ability to telework from home, which is the accommodation she sought as an RA and was unlawfully denied. Even the full-time telework accommodation she alternately sought for a limited period of time was barely more than what was permitted for all employees under Defendant's liberal telework policy, and had been granted to Ms. Yochim by a previous supervisor on an informal, as-needed basis before she engaged in protected EEO activity.

5.)     Defendant's failure to accommodate Ms. Yochim and its concomitant bad faith failure to engage in the interactive RA process needlessly caused Ms. Yochim to suffer severe physical and emotional pain, and unnecessarily caused her to use an extraordinary amount of accrued sick and annual leave thereby diminishing her retirement benefits. In the end, Ms. Yochim retired years before she otherwise would have because defendant unlawfully made it impossible for her to work and obtain needed medical care.

6.)     Defendant's ongoing retaliation and harassment during this same time period included issuing Ms. Yochim unjustifiably poor performance appraisals and denying her one or more cash bonuses that she would have been automatically entitled to based on her performance,

2

placing Ms. Yochim on pretextual leave restrictions, completely revoking her ability to telework, denying her credit hours and religious comp time, and initiating unwarranted discipline against her.  All of these actions combined to tarnish Ms. Yochim's remarkable 20-plus year career and damage her previously impeccable professional reputation.

7.)     By way of relief, Ms. Yochim is seeking:   a.) Compensatory damages; b.) Equitable relief for the accrued sick and annual leave she was improperly required to use when her RA requests were unlawfully denied; c.) Equitable relief for the religious comp time she had to "repay" to the agency upon her retirement; d.) The monetary performance bonuses she would have received in fiscal year 2013 and 2014 if her ratings had been at the "Outstanding" level; e.) An adjustment to her retirement benefit to reflect what it would have been had Defendant not improperly required Ms. Yochim to exhaust all of her sick leave; f.) Record correction; and g.) An award of attorneys' fees and costs.

## PARTIES, JURISDICTION, AND VENUE

8.)     Plaintiff, Elisa J. Yochim was, at the time of the actions that gave rise to this Complaint, a GS-14 Trial Attorney with the U.S. Department of Housing and Urban Development's regional office in Chicago, Illinois.  She is and was at all times relevant to this action a resident of Cook County, Illinois.

9.)     Defendant, Julián Castro, is the Secretary of Housing and Urban Development, the Cabinet official who heads HUD, and is sued in his official capacity only.  HUD is a department in the Executive Branch of the federal government, the mission of which includes creating strong, sustainable, inclusive communities and fostering the provision of affordable homes.

10.)     Jurisdiction of this Court is based upon 28 U.S.C. §1332; 29 U.S.C. § 794a(a)(1); and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-5(c)).  Venue lies here pursuant to 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), because the actions of defendant at issue were taken by defendant's management from their duty stations in this judicial district, where plaintiff was employed at the time the actions occurred.

## STATEMENT OF FACTS

### Background

11.)     In 1989, Ms. Yochim joined HUD as a GS-13 Attorney Advisor in the Headquarters office in Washington, D.C., and subsequently served as an Attorney Advisor in HUD's Office of Regional Counsel in Chicago, Illinois, first in the Milwaukee Field Office and then in the Chicago Regional Office.  Ms. Yochim received a competitive promotion to GS-14 in August of 2000.

12.)     For over 20 years, Ms. Yochim served as the sole procurement attorney for Region V, which is comprised of all HUD offices in Illinois, Indiana, Michigan, Minnesota, and Ohio.  She litigated bid protests and resulting Board of Contract Appeals cases and assisted the Department of Justice with related federal court litigation.

13.)     In addition, Ms. Yochim was the staff attorney responsible for handling all Standards of Conduct, Procurement Integrity, and Hatch Act related matters within Region V.

14.)     Prior to engaging in protected activity, she uniformly earned the highest performance rating of "Outstanding" on her annual appraisals, with only one or two ratings at the second-highest "Highly Satisfactory" level.

4

**Ms. Yochim's EEO Complaint**

15.) In May of 2012, Ms. Yochim applied for two GS-15 positions – one in HUD's Headquarters office, and one in the Chicago Regional Office. She made the best qualified list for both positions and was interviewed, but was not selected for either.

16.) The selectees were both significantly younger women who were far less qualified than Ms. Yochim and not of her religion (Jewish). One of them was Lisa Danna-Brennan, who became Ms. Yochim's first-level supervisor in October of 2012 and was the principal antagonist in Defendant's unlawful actions.

17.) Ms. Yochim had substantial grounds to believe that she had been discriminated against in the non-promotions, and for the first time in her long career, she initiated the administrative EEO complaints process. She later amended her complaint and filed a second complaint to include the claims that are at issue in this action. All of Ms. Yochim's claims and amendments were timely raised, accepted, and investigated by the agency. Although Ms. Yochim had a well-founded belief that she was discriminated against, the instant action does not include either of the non-promotion claims.

**Ms. Yochim's Surgery in November of 2012**

18.) Ms. Yochim suffered from bi-lateral carpal tunnel syndrome for many years before undergoing release surgery on her right hand in November of 2012. As a result of the condition, and later as a result of the surgery, Ms. Yochim was substantially impaired in major life activities that required hand strength such as lifting and grasping. For a period of time after her surgery, she was unable to hold even the weight of a coffee cup in her right hand.

5

19.)    Ms. Yochim had delayed having the carpal tunnel surgery for more than 10 years while she tried less-invasive treatments.  By the fall of 2012, however, Ms. Yochim was in too much pain to put off the procedure due to significant nerve damage in her hand and wrist.

20.)    At that time, Ms. Yochim was carrying a positive sick leave balance of 556 hours and an annual leave balance of almost 354 hours.

21.)    Prior to undergoing surgery, in August of 2012, Ms. Yochim orally informed Courtney Minor and Janet Elson, who were the Regional Counsel and Deputy Regional Counsel for Region V, respectively, that she was planning to have the procedure on her right hand, but offered to wait until after the end of the fiscal year due to the high volume of year-end procurement work.  Ms. Yochim advised Mr. Minor and Ms. Elson that she would need to work from home for an extended period during her recuperation, and Mr. Minor assured her that he would arrange for her to do so.  Until the actions that gave rise to this Complaint, Mr. Minor had described Ms. Yochim as the "poster child" for telework.

### Ms. Yochim's First Request for Reasonable Accommodation and the Agency's Concealment of Its Partial Approval

22.)    Following Ms. Yochim's surgery on November 1, 2012, she suffered significant pain and weakness in her right hand as a result of her ligaments being cut during the procedure. She needed occupational therapy and/or ultrasound therapy on a near-daily basis.

23.)    Ms. Yochim kept her new supervisor, Ms. Danna-Brennan, apprised of her medical condition, and submitted timely requests to work from home, when she was able to, for the remainder of November.

24.)    By December, despite being under a doctor's care and undergoing regular occupational therapy, Ms. Yochim had only made minimal progress in her recovery and

6

continued to experience considerable pain, swelling, and weakness in her right hand. These conditions caused her to be substantially limited in performing several major life activities.

25.) She was unable to grasp the hand rails on the commuter train that she normally took to and from work, or stop herself from falling in wintery weather conditions. Additionally, Ms. Yochim's need for frequent occupational therapy and other medical treatment continued.

26.) Despite her physical limitations, Ms. Yochim was able to perform the essential functions of her job, which included providing legal counsel, review, and assistance for agency litigation; providing program advice and counseling; furnishing legal services for program assistance and enforcement; rendering advisory services regarding Standards of Conduct and other ethics matters; and preparing ethics opinions. Apart from occasionally consulting with Mr. Minor by phone or email about ethics issues, she continued to work completely independently.

27.) Ms. Yochim had consistently demonstrated that she could perform all of her duties from home. She had been teleworking two days per week for years pursuant to the agency's liberal telework policy, and had successfully worked at home for an extended period following a previous medical procedure in 2004. HUD's Departmental Telework Policy automatically permitted employees to telework up to three days per week.

28.) Ms. Yochim requested to telework full-time through the end of January of 2013. Contrary to Mr. Minor's handling of her previous period of extended telework, Ms. Danna-Brennan told her that she would have to submit a formal RA request. Ms. Yochim did so on December 5, 2012, and subsequently provided supporting medical documentation from her surgeon, at Ms. Danna-Brennan's request.

29.)    Ms. Yochim's surgeon confirmed that she had "diminished right hand strength" and could "not rely on gripping with that hand," and supported her need to work from home through the end of January 2013.

30.)    At no point after Ms. Yochim submitted her RA request did Ms. Danna-Brennan, Mr. Minor, or anyone else discuss with Ms. Yochim her need for accommodation, her limitations, her diagnosis or prognosis, any needed additional medical documentation, or any alternative accommodations the agency was considering.

31.)    Mr. Minor approved Ms. Yochim's RA request to work from home in mid-December, but she was never notified of the approval and only learned about it months later. Despite being approved for full-time telework, Ms. Yochim was only permitted to telework three additional days in December.

32.)    Mr. Minor's approval stated, "Employee has been allowed to telework throughout the month of December . . . Without further information, it is indeterminate whether a reasonable accommodation until the end of January is required."    Notwithstanding that last sentence, Ms. Yochim was not advised that she needed to provide "further information" or what such information should entail.  Neither was she unwilling to provide it upon request.

33.)    Without informing Ms. Yochim about the disposition of her RA request for December, or conferring with her, on January 2, 2013, Ms. Danna-Brennan advised Ms. Yochim that "the agency [was] not required to accommodate" her and that Ms. Danna-Brennan expected her to adhere to her regular schedule.   Ms. Dana-Brennan based her decision on research showing that HUD did not have to transport Ms. Yochim to and from work or facilitate it, which was not an accommodation that Ms. Yochim had requested.

34.) The agency did advise Ms. Yochim that she could work a compressed schedule of four ten-hour days per week with two of them being telework days. This was not an accommodation; rather, it was an alternative work schedule that was available to all employees.

35.) In any case, Ms. Yochim was not physically able to consistently work ten hours per day, which is something the agency would have known if it had engaged in the interactive process with her before denying her RA request.

36.) Without any viable alternatives after Defendant denied her RA request, Ms. Yochim was forced to take sick leave on the days she was required to report to the office.

**Defendant's Retaliation**

37.) Throughout January and February of 2013, Ms. Yochim attempted to maintain a regular work load by accomplishing as much as she could on her two telework days and using her accrued sick leave on the other three days. During those two months[2], she was forced to use approximately 128 hours of sick leave and 72 hours of annual leave.

38.) Although Ms. Danna-Brennan eventually allowed Ms. Yochim to begin working a third telework day per week in mid-February, which was permitted for non-disabled employees throughout HUD, she still made it impossible for Ms. Yochim to work a full 40 hour week and forced her to take unnecessary leave.

**Defendant's Denial of Ms. Yochim's Second Request for Reasonable Accommodation**

39.) Ms. Yochim resumed working at the agency's office in downtown Chicago on some days towards the end of February of 2013, but the increased strain on her hand from travel to and from work had a negative impact on her recovery. She took a couple of falls on the ice while commuting and was not able to catch herself because of her weak grasp.

---

[2] This leave usage is through the end of pay period 4 on March 9, 2013.

40.)    Ms. Yochim consulted with her doctor who advised that she should work from home through June of 2013 to avoid further trauma to her hand and to allow her to continue with occupational therapy. The doctor wrote a letter to that effect, which Ms. Yochim submitted along with her second formal RA request on March 12, 2013.

41.)    Ms. Yochim clarified at the time she submitted her RA request that she was <u>not</u> seeking an accommodation for her commute, but that she was asking to work from home for a defined period of time.

42.)    Again, without engaging ***at all*** in the interactive process that is required under the Rehabilitation Act/ADA, Ms. Danna-Brennan, with the approval of Mr. Minor and Ms. Elson, denied Ms. Yochim's request on April 4, 2013, claiming that there was "no nexus between [her] carpal tunnel limitation and the requested accommodation." The only alternative accommodations she offered were essentially the same unsatisfactory ones she offered in January, which did not fully address Ms. Yochim's need for accommodation

43.)    If Defendant had engaged in the interactive process, Ms. Yochim would have been able to explain that she was not asking for an accommodation to commute, discuss the inadequacy of defendant's proposed alternative accommodations, provide further medical documentation if requested, and potentially present other options that would have been accepted by Ms. Danna-Brennan.

44.)    Ms. Yochim appealed Ms. Danna-Brennan's denial to HUD's Reasonable Accommodation Committee ("RAC"). On May 10, 2013, the RAC ruled that Ms. Yochim was entitled to continue 3 days of telework per week, and it granted her a modified work schedule that allowed her to work from home for 2 hours on the mornings that she had to report to the office so she could avoid rush hour on the train. Those modified accommodations, which were

still inadequate, continued through June 24, 2013. They were not retroactive and did not address the harm caused to Ms. Yochim by Defendant's previous denial of accommodation.

45.) During pay periods 9 through 12, which roughly correspond to the dates that Ms. Yochim was under the modified accommodations, she used 43 hours of sick leave, which brought her total sick leave usage for calendar year 2013 to 296 hours due to defendant's failure to accommodate her.

**Defendant Places Ms. Yochim on Unwarranted Leave Restrictions**

46.) On April 2, 2013, two days before Ms. Danna-Brennan denied Ms. Yochim's second RA request, she sent Ms. Yochim an email in which she stated that she would not approve sick leave for days when Ms. Yochim was "able and willing to perform the essential functions of [her] job" but needed to do them from home. She also warned that she would "not approve annual leave when [Ms. Yochim's] presence in the office [was] required."

47.) In the same email, Ms. Danna-Brennan falsely accused Ms. Yochim of failing to keep her apprised of her workload, and threatened to force Ms. Yochim to report to the office on her telework days, "until [she had] sufficient workload to perform at home."

48.) Three weeks later, on April 29, 2013, Ms. Danna-Brennan placed Ms. Yochim on leave restrictions due to her alleged "manipulation" of credit hours and religious comp time since 2009 (three years before Ms. Danna-Brennan became her supervisor), and her supposedly excessive use of sick leave since her surgery in November of 2012. This action was utterly unjustified and unprecedented in Ms. Yochim's career.

49.) Further, Ms. Danna-Brennan required Ms. Yochim to submit a detailed plan to her for approval before she could work any hours to "repay" religious leave she had used for

Jewish holidays.   When Ms. Yochim complied, however, Ms. Danna-Brennan pretextually denied them.

### Ms. Yochim is Issued Negative Mid-Year and Annual Performance Appraisals for the First Time in Her Career

50.)    On May 16, 2013, Ms. Danna-Brennan issued Ms. Yochim a mid-year performance review that included pretextual and highly negative comments in the narrative portions of her performance elements.  That appraisal was the precursor to the pretextual annual performance rating of "Fully Satisfactory" that Ms. Danna-Brennan would issue Ms. Yochim at the end of Fiscal Year 2013.

51.)    In her narrative comments to the FY 2013 appraisal, among other things, Ms. Danna-Brennan falsely accused Ms. Yochim of failing to cooperate with new case opening and closing protocols; not being cooperative and professional; and not being willing to comply with HUD time and attendance policies.

52.)    Ms. Yochim had never before received a negative performance appraisal, either mid-year or annual, in her twenty-plus year career with HUD.  By rating Ms. Yochim as "Fully Satisfactory," Ms. Danna-Brennan caused her to receive a lower monetary performance bonus.

### Ms. Danna-Brennan Unnecessarily Requires Ms. Yochim to Submit an RA Request for a Minor Schedule Variance

53.)    In the winter of 2013, Ms. Yochim began experiencing swollen joints and severe joint pain, particularly in her hands, hips, and knees, and was referred to a rheumatologist by her treating physician.  After several tests, she was diagnosed in January of 2014 with osteoarthritis and possible calcium pyrophosphate deposition disease ("CPPD").   X-rays showed joint separation in her hands and other joints and bone-on-bone contact in her right knee.

12

54.)    She was prescribed prescription pain medicine and anti-inflammatories, which helped treat her symptoms for a period of time; however, she was forced to discontinue taking them when bloodwork revealed that she had dangerously elevated liver enzymes.

55.)    As an alternative to prescription medicine, Ms. Yochim's doctor prescribed physical therapy several times per week to strengthen Ms. Yochim's muscles around the inflamed joints.  Ms. Yochim was also advised to rest and ice her joints following the therapy sessions.

56.)    In response to a request by Ms. Elson in April of 2014, Ms. Yochim provided an updated form requesting to begin work at 7:00 AM on her telework days and 8:30 AM on her in-office days.  She asked for the variation in start time so that she could schedule her physical therapy appointments after completing her work on telework days, and start work later on mornings when she was required to report to the office.  Ms. Yochim typically experienced the most stiffness and joint pain from her osteoarthritis in the morning.

57.)    This type of schedule variance was permitted and within the authority of a supervisor to grant according to the HUD Alternative Work Schedule Handbook.

58.)    Ms. Yochim provided medical justification for requesting different start times on different days.  On April 3, 2014, Ms. Elson advised Ms. Yochim that the information she provided appeared to be sufficient, and that her request to change hours could probably be approved without going through the RA process.

59.)    Rather than approving the variance as she was authorized to do, Ms. Danna-Brennan required Ms. Yochim to submit a formal RA request.

60.)    After Ms. Yochim submitted her RA request, the headquarters RA office told her that it was not necessary, which forced Ms. Danna-Brennan to approve it on June 13, 2014.

61.)    Ms. Danna-Brennan's bad faith in delaying the approval was evident when, within a week of granting the schedule variance, she cancelled Ms. Yochim's telework altogether.

**Ms. Danna-Brennan Suspends Ms. Yochim's Ability to Telework**

62.)    On June 20, 2014, Ms. Danna-Brennan issued Ms. Yochim an Official Reprimand for supposedly not complying with an artificial "Ethics Deadline Policy."

63.)    Ms. Yochim responded to the reprimand with concrete evidence demonstrating that she *had* in fact been timely with her ethics assignments in accordance with the policy.

64.)    Notwithstanding Ms. Yochim's irrefutable documentation, Ms. Danna-Brennan suspended all telework privileges for Ms. Yochim.  As a result, by the end of December, Ms. Yochim's sick leave usage for the year had skyrocketed to 360 hours.

**Defendant's Denial of Ms. Yochim's Third Request for Accommodation**

65.)    Without the ability to telework, Ms. Yochim encountered great difficulty in attending her physical therapy appointments.  She had to take sick leave for each appointment and then take the train in to work immediately afterward – for total of approximately half a day each time.  Because she was in a rush to get to work and minimize her leave usage, Ms. Yochim was not able to ice her joints and rest after her therapy appointments as her doctor had urged.

66.)    The osteoarthritis and CPPD significantly limited Ms. Yochim's range of motion upon awakening and in the mornings, caused considerable pain in her joints, and made it difficult for her to accomplish even simple tasks or errands that required mobility.  As a result, she was substantially limited in several daily life activities such as walking any significant distance, climbing and descending stairs, and bending without pain.

14

67.)     It became challenging for Ms. Yochim to walk from the downtown train station to her office, which was several blocks away.  Once she arrived at her office, Ms. Yochim had difficulty accomplishing routine tasks that required much walking within the building.  Even going to the ladies' room, which was located some distance from her office, was taxing.

68.)     As before, Ms. Yochim was still able to perform the essential functions of her job, including performing litigation-related duties, providing program advice and counseling, providing legal services for program assistance and enforcement, and carrying out ethics law duties.

69.)     She therefore submitted a request for reasonable accommodation in August of 2014 in which she sought an accommodation to telework three days per week for a period of six months.  In other words, she wanted to return to the schedule she had before Ms. Danna-Brennan revoked her telework.

70.)     This accommodation would have allowed Ms. Yochim to schedule medical appointments at the beginning and end of her telework days, and to follow her doctor's recommendation to rest and ice her joints following therapy.

71.)      In support of her RA request, Ms. Yochim submitted a report from her doctor which provided extensive detail about her diagnosis, prognosis, and the limitations on her daily life activities caused by her condition.

72.)     The doctor recommended that Ms. Yochim telework five days per week, but recognizing that Defendant had not been amenable to that previously, asked that Ms. Yochim at least be permitted to telework three days per week and to start work later on her in-office days.

73.)     Ms. Yochim submitted her RA request on August 7, 2014.  Again, without engaging in the interactive process, Ms. Danna-Brennan denied the request in full on September

25, 2014.  While Ms. Danna-Brennan offered a few "alternative accommodations," none were effective at addressing Ms. Yochim's medical condition, and several were extremely disingenuous.

74.)    In the RA denial, Ms. Danna-Brennan falsely stated that Ms. Yochim had declined to submit a Federal Occupational Health Authorization for Disclosure of Information form in order to allow defendant's physicians to review her physician's reports.  In fact, she had.

75.)    The denial also cited Ms. Yochim's alleged performance deficiencies.

76.)    As a result of Defendant's refusal to accommodate her, Ms. Yochim's medical condition worsened.  She experienced increased pain and stiffness, which caused her to need additional medical treatment.  By the time Ms. Yochim retired in May of 2015, she was in severe pain and had burned through all of her sick leave and most of her annual leave.  She felt that she had no choice but to retire so she could continue the medical treatment she so desperately needed.

**Ms. Danna-Brennan Refuses to Grant Credit Hours and Interferes with Ms. Yochim's Ability to Make-up Religious Leave**

77.)    Throughout Ms. Danna-Brennan's tenure as Ms. Yochim's supervisor, she routinely denied, in whole or in part, Ms. Yochim's requests to work credit hours.

78.)    Ms. Yochim was a professional, salaried, non-bargaining unit employee and therefore was not permitted under federal regulations to earn overtime.  However, she could work hours over and above her regular tour of duty, called "credit hours," which she could accumulate and use in lieu of leave for time off.  The credit hour policy had no provision for a supervisor to disapprove an employee's Notice to Work Credit Hours provided that the employee had work to perform.

16

79.)     Historically, Ms. Yochim had been granted credit hours by her previous supervisors to enable her to address influxes of work.  Ms. Danna-Brennan, by contrast, did not permit Ms. Yochim the same ability.

80.)     This became particularly problematic after Defendant denied Ms. Yochim's requests for accommodation and she was forced to use sick leave on her in-office days.  Due to the disruption in her work schedule, Ms. Yochim had an enormous amount of work to perform on her telework days.

81.)     She tried to address the backlog by requesting to work credit hours on those days, but Ms. Danna-Brennan either refused Ms. Yochim's requests or placed onerous restrictions on their approval.  Ms. Danna-Brennan then seized on Ms. Yochim's supposed inability to meet deadlines to attack her performance.

82.)     Ms. Danna-Brennan likewise imposed overly-restrictive administrative requirements on Ms. Yochim's requests to make-up hours for religious leave that she had taken for Jewish holidays, or she denied them outright.  These restrictions violated HUD and OPM policies.

83.)     In one instance, Ms. Danna-Brennan told Ms. Yochim that she could not earn religious comp time by performing a certain type of ethics work involving OGE 450 Confidential Financial Disclosures (called "450 reviews") after-hours or on weekends because she would not be able to communicate with the employees.  In actuality, Ms. Yochim's review of the OGE 450 forms rarely required anything more than emails for verification.

84.)     The unwarranted restrictions imposed by Ms. Danna-Brennan on Ms. Yochim's ability to earn religious comp time made it impossible for Ms. Yochim to make-up her religious

leave.  As a result, Ms. Yochim was not paid for work she performed and was forced to use her annual leave to "repay" 37 hours of religious leave when she retired.

## Ms. Danna-Brennan Issues Ms. Yochim an "Unsatisfactory" Performance Rating for FY 2014

85.)    On October 28, 2014, Ms. Danna-Brennan issued Ms. Yochim a performance appraisal with an overall rating of "Unsatisfactory" for Fiscal Year 2014.  That same day, in a meeting between Ms. Danna-Brennan, Ms. Elson, and Ms. Yochim to go over the appraisal, Ms. Danna-Brennan stated that although Ms. Yochim's substantive work was rated as "Highly Successful," her overall rating of "Unsatisfactory" was due to her supposed lack of respect for Ms. Danna-Brennan.

86.)    In the appraisal, Ms. Danna-Brennan rated Ms. Yochim as "Excellent/Highly Successful" in the two objective critical elements that concerned her work production and performance, and as "Marginally Successful" and "Unacceptable" in the two subjective critical elements based Ms. Danna-Brennan's pretextual account of Ms. Yochim's interpersonal skills.

87.)    Throughout Ms. Danna-Brennan's barrage of retaliatory actions against her, Ms. Yochim had maintained her composure and decorum.  She interacted professionally with Ms. Danna-Brennan, her other supervisors, colleagues and support staff at all times and complied with all of her supervisors' directions.

88.)    The "Unsatisfactory" appraisal not only severely damaged Ms. Yochim's previously stellar professional reputation, it cost her the monetary bonus that was awarded to employees with ratings at the "Exceeds Fully Successful" or "Outstanding" level, which Ms. Yochim deserved.

**Ms. Danna-Brennan Proposes to Suspend Ms. Yochim for Three Days Without Pay
And Suspension of One Day Without Pay**

89.)     On December 19, 2014, Ms. Danna-Brennan issued Ms. Yochim a Notice of Proposal to Suspend for three days without pay.

90.)     The basis for the proposed suspension was the pretext that Ms. Yochim had allegedly engaged in "rude and disruptive conduct towards a supervisor" in two meetings that occurred many months earlier – in August and October of 2014 – and failed to carry out supervisory instructions by refusing to request an extension on an ethics matter.

91.)     Ms. Yochim submitted an extensive, sixteen-page reply to the Notice in which she disputed point-by-point Ms. Danna-Brennan's inaccurate recitation of the facts and confirmed that she had not been disrespectful in any way and had performed her duties on time and with superior results.

92.)     On February 12, 2015, Ms. Danna-Brennan rescinded the December 19, 2014 Proposal to Suspend and issued an Amended Notice of Proposal to Suspend for three days.  The Amended Notice contained the same charges, but the specifications were slightly different.

93.)     Ms. Yochim submitted another detailed written response to the Amended Proposal on February 25, 2015.

94.)     Ultimately, on March 24, 2015, Mona Fandel, Regional Counsel for Region X, issued a decision dismissing the charge of rude and disruptive conduct, and mitigating the proposed penalty for failure to carry out supervisory instructions to a one-day suspension without pay, which Ms. Yochim served.

**Ms. Yochim's Decision to Retire**

95.)     By May of 2015, it was clear to Ms. Yochim that Defendant was not going to stop Ms. Danna-Brennan from retaliating against her or denying her reasonable accommodation.

96.)    She was physically and emotionally exhausted, in significant pain, and on the verge of running out of sick and annual leave, without which she could not receive the medical treatment she required.  Her sick leave balance had been reduced to zero from 556 hours on November 1, 2012, and her annual leave went from 354 hours to 146 hours during the same time frame.  Ms. Yochim therefore made the painful decision to retire several years before she would have if not for Defendant's actions, and leave behind the career that she had previously found so rewarding.

97.)    Ms. Yochim's last day of employment with Defendant was May 30, 2015. Defendant's actions, which had caused Ms. Yochim to use leave unnecessarily, meant that she only received a fraction of the payment that a federal employee is entitled to for accumulated annual leave upon retirement.  In addition, because Ms. Yochim was improperly required to use so much of her accumulated sick leave, she did not receive credit for those hours when she retired and her annuity was substantially reduced as a result.

## Exhaustion of Administrative Remedies

98.)    Ms. Yochim timely initiated the agency's EEO complaints process on July 18, 2012 and filed her formal complaint (No. HUD-00094-2012) on September 5, 2012.  She amended her complaint as required to add the additional claims of discrimination and reprisal that are at issue in this case, all of which were accepted and investigated by the agency.

99.)    Ms. Yochim timely filed a Request for Hearing with the EEOC over HUD-00094-2012 on January 31 2014, where it was pending until she requested a remand to the agency for a Final Agency Decision ("FAD") on August 8, 2014.  The agency has not yet issued its FAD on that complaint.

100.)    Ms. Yochim sought EEO counseling again on March 3, 2014 and filed a second formal complaint (No. HUD-00028-2014) on April 21, 2014, which she also timely amended as required to include claims over the agency's ongoing discrimination, reprisal, and failure to accommodate.  All of her claims were accepted and investigated by the agency.

101.)    The agency issued the Report of Investigation for HUD-00028-2014 on November 10, 2015.  Ms. Yochim requested that the agency issue a FAD on that complaint.  To date, no FAD has been issued.  With these actions and others, Ms. Yochim exhausted the administrative remedies available to her.

## COUNT I

### (Failure to Reasonably Accommodate, September 25, 2014)

102.)    Plaintiff repeats the allegations contained in paragraphs 1 through 101 above, as though fully set forth here.

103.)    In September of 2014, Plaintiff was an individual with a disability having a record of physical impairment, and was regarded by Defendant as having a physical impairment; specifically, she suffered from osteoarthritis and calcium pyrophosphate deposition disease ("CPPD") in her hands, wrists, hips, and knees.

104.)    Plaintiff's disability substantially limited one or more major life activities including but not limited to Plaintiff's ability to walk any significant distance without pain, climb or descend stairs without difficulty, bend down without pain, or use her hands for tasks that required fine motor skills.  Plaintiff also required physical therapy and/or medical treatment several times per week for treatment of her medical condition.

105.)    Plaintiff was a qualified individual with a disability because, with or without reasonable accommodation, she was able to perform the essential functions of her job with HUD.

Plaintiff had been performing her duties from home twice or more per week on a routine basis for several years prior to making her request for accommodation. She had also successfully worked from home, with her supervisor's approval, for an extended period of time following a medical procedure in 2004.

106.) In August of 2014, Plaintiff submitted a written request for reasonable accommodation in which she sought to be permitted to work from home three days per week for six months pursuant to her doctor's recommendation. Plaintiff provided documentation of her medical condition and her doctor's recommendation to Defendant.

107.) Defendant wrongfully denied Plaintiff's request for accommodation on September 25, 2014.

108.) Defendant failed to engage in the interactive process with Plaintiff by discussing her diagnosis, prognosis, or by proposing alternative accommodations with her or her doctor prior to denying her request for accommodation.

109.) The alternative accommodations offered by Defendant in September of 2014 were inadequate to address Plaintiff's disabilities.

110.) By denying Plaintiff's request for reasonable accommodation and failing to engage in good faith in the interactive process, Defendant violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq.

111.) Defendant's violation of the Rehabilitation Act impeded Plaintiff's ability to receive needed medical treatment; caused her to unnecessarily use significant amounts of sick and annual leave; negatively impacted her retirement annuity and annual leave payout upon retirement; caused injury to her career and professional reputation; and caused her to suffer

physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT II

**(Retaliatory Hostile Work Environment/Failure to Engage in Interactive Process)**

112.) Plaintiff repeats the allegations contained in paragraphs 1 through 111 above, as though fully set forth here.

113.) Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3) by filing an EEO complaint of discrimination in September of 2012, and continuously since then by continuing to amend her complaint(s), file new complaints, and pursue her claims.

114.) Plaintiff engaged in protected activity under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq., by requesting reasonable accommodation in December of 2012, March of 2013, and August of 2014. She also continuously engaged in protected activity between January of 2013 and May of 2015 by filing one or more administrative complaints over her RA denials, amending her complaints, and pursuing her claims.

115.) Beginning no later than January of 2013, Defendant intentionally subjected Plaintiff to a retaliatory hostile and abusive work environment by the following actions, among others: denying Plaintiff's request to change telework days on February 7, 2013; denying Plaintiff's request for situational telework on February 26, 2013 and other occasions; threatening to deny Plaintiff's sick and annual leave on April 2, 2013; threatening to remove Plaintiff's telework privileges on April 2, 2013; unreasonably denying all or part of Plaintiff's requests to make-up religious leave on numerous occasions between January of 2012 and May of 2015; unreasonably denying all or part of Plaintiff's requests to work credit hours on numerous

occasions between January of 2012 and May of 2015; issuing her an unwarranted Official Reprimand in June of 2014; issuing her "Fully Satisfactory" and "Unsatisfactory" annual performance appraisals in January and November of 2014; and suspending her without pay on March 30, 2015.

116.) Additionally, Defendant failed to engage in the interactive reasonable accommodation process in good faith by concealing its partial grant of RA in December of 2012 and the terms of its continuance; denying Plaintiff's RA requests based on inapplicable and erroneous legal reasons; improperly rejecting Plaintiff's medical documentation of her conditions; failing to ask Plaintiff to provide additional medical documentation when insufficient documentation was an alleged reason for Defendant's RA denial; imposing leave restrictions on Plaintiff when she used her sick leave for medical treatment; requiring Plaintiff to submit an unnecessary reasonable accommodation request in April of 2014; and delaying her request for a minor variance in her work schedule by two months in April through June of 2014.

117.) By the foregoing actions and others, Defendant took materially adverse action against Plaintiff that would likely dissuade a reasonable employee from making or supporting a charge of discrimination, opposing unlawful employment practices in violation of Title VII, and/or requesting reasonable accommodation under the Rehabilitation Act. Additionally, as a result of Defendant's failure to engage in the interactive process in good faith, Defendant failed to identify an appropriate accommodation for Plaintiff.

118.) Defendant's violation of Title VII and the Rehabilitation Act impeded Plaintiff's ability to receive needed medical treatment; caused her to unnecessarily use significant amounts of sick and annual leave; negatively impacted her retirement annuity and annual leave payout upon retirement; caused injury to her career and professional reputation; and caused her to suffer

physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT III

### (Failure to Reasonably Accommodate, April 4, 2013)

119.)   Plaintiff repeats the allegations contained in paragraphs 1 through 118 above, as though fully set forth here.

120.)   In March of 2013, Plaintiff was an individual with a disability having a record of physical impairment, and was regarded by Defendant as having a physical impairment; specifically, she suffered chronic pain, swelling, and weakness in her right hand as a result of undergoing carpal tunnel surgery.

121.)   Plaintiff's disability substantially limited one or more major life activities including but not limited to Plaintiff's ability to lift any significant weight or grasp things with her right hand; to write; and to stabilize herself when walking in slippery conditions or taking public transportation.  Plaintiff also required occupational therapy and medical treatment for her hand several times per week.

122.)   Plaintiff was a qualified individual with a disability because, with or without reasonable accommodation, she was able to perform the essential functions of her job with HUD. Plaintiff had been performing her duties from home twice per week on a routine basis for several years prior to making her request for accommodation.  She had also successfully worked from home with her supervisor's approval for an extended period of time following a medical procedure in 2004.

123.)   In March of 2013, Plaintiff submitted a written request for reasonable accommodation in which she sought to be permitted to work from home full-time through June

30, 2013 pursuant to her doctor's recommendation. Plaintiff provided documentation of her medical condition and her doctor's recommendation to Defendant.

124.) Defendant wrongfully denied Plaintiff's request for accommodation on April 4, 2013.

125.) Defendant failed to engage in the interactive process with Plaintiff by discussing her diagnosis, prognosis, or proposed alternative accommodations with her or her doctor prior to denying her request for accommodation.

126.) The alternative accommodations offered by Defendant in April of 2013 were inadequate to address her disabilities, and were disingenuous and in bad faith.

127.) By denying Plaintiff's request for reasonable accommodation and failing to engage in good faith in the interactive process, Defendant violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq.

128.) Defendant's violation of the Rehabilitation Act impeded Plaintiff's recovery from surgery; caused her to unnecessarily use significant amounts of sick and annual leave; negatively impacted her retirement annuity and annual leave payout upon retirement; caused injury to her career and professional reputation; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT IV

**(Failure to Reasonably Accommodate, January 2, 2013)**

129.) Plaintiff repeats the allegations contained in paragraphs 1 through 128 above, as though fully set forth here.

130.) In January of 2013, Plaintiff was an individual with a disability having a record of physical impairment, and was regarded by Defendant as having a physical impairment;

specifically, she suffered chronic pain, swelling, and weakness in her right hand as a result of undergoing carpal tunnel surgery.

131.) Plaintiff's disability substantially limited one or more major life activities including but not limited to Plaintiff's ability to lift any significant weight or grasp things with her right hand; to write; and to stabilize herself when walking in slippery conditions or taking public transportation. Plaintiff also required occupational therapy and medical treatment for her hand several times per week.

132.) Plaintiff was a qualified individual with a disability because, with or without reasonable accommodation, she was able to perform the essential functions of her job with HUD. Plaintiff had been performing her duties from home twice per week on a routine basis for several years prior to making her request for accommodation. She had also successfully worked from home, with her supervisor's approval, for an extended period of time following a medical procedure in 2004.

133.) In December of 2012, Plaintiff submitted a written request for reasonable accommodation in which she sought to be permitted to work from home full-time in December 2012 and January 2013 pursuant to her doctor's recommendation. Plaintiff provided documentation of her medical condition and her doctor's recommendation to Defendant.

134.) Defendant approved Plaintiff's reasonable accommodation request to work from home in December of 2012, but did not advise Plaintiff of this decision or request any further medical documentation from Plaintiff.

135.) On January 2, 2013, Defendant informed Plaintiff that her request for accommodation was denied.

27

136.) Defendant failed to engage in the interactive process by discussing her diagnosis, prognosis, or proposed alternative accommodations with her or her doctor prior to denying her request for accommodation.

137.) The alternative accommodations offered to Plaintiff by Defendant in January of 2013 were inadequate to address her disabilities, and were disingenuous and in bad faith.

138.) By denying Plaintiff's request for reasonable accommodation and failing to engage in good faith in the interactive process, Defendant violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq.

139.) Defendant's violation of the Rehabilitation Act Defendant's violation of the Rehabilitation Act impeded Plaintiff's recovery from surgery; caused her to unnecessarily use significant amounts of sick and annual leave; negatively impacted her retirement annuity and annual leave payout upon retirement; caused injury to her career and professional reputation; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT V

**(Title VII and/or Rehabilitation Act Reprisal - Telework Suspended, June 20, 2014)**

140.) Plaintiff incorporates the allegations contained in paragraphs 1 through 139 above, as though fully set forth here.

141.) Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3) by filing an EEO complaint of discrimination in September of 2012, and continuously since then by continuing to amend her complaint(s), file new complaints, and pursue her claims.

142.)  Plaintiff engaged in protected activity under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq., by requesting reasonable accommodation in December of 2012, March of 2013, and August of 2014.  She also continuously engaged in protected activity between January of 2013 and May of 2015 by filing one or more administrative complaints over her RA denials, amending her complaints, and pursuing her claims.

143.)  Defendant retaliated against Plaintiff on account of her protected activities by revoking all of Plaintiff's telework privileges on June 20, 2014.

144.)  Plaintiff demonstrated through documented evidence that Defendant's alleged basis for this action was false.

145.)  Defendant's pretextual revocation of Plaintiff's telework impeded Plaintiff's ability to obtain medical treatment; negatively impacted her retirement annuity and annual leave payout upon retirement; caused her to unnecessarily use significant amounts of sick and annual leave; caused injury to her career and professional reputation; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

146.)  By the foregoing actions, Defendant took materially adverse action against Plaintiff that would dissuade a reasonable employee from making or supporting a charge of discrimination, opposing unlawful employment practices, or making a request for reasonable accommodation.

## COUNT VI

### (Title VII and/or Rehabilitation Act Reprisal – Suspended Without Pay March 30, 2015)

147.)  Plaintiff incorporates the allegations contained in paragraphs 1 through 146 above, as though fully set forth here.

148.)    Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3) by filing an EEO complaint of discrimination in September of 2012, and continuously since then by continuing to amend her complaint(s), file new complaints, and pursue her claims.

149.)    Plaintiff engaged in protected activity under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq., by requesting reasonable accommodation in December of 2012, March of 2013, and August of 2014.  She also continuously engaged in protected activity between January of 2013 and May of 2015 by filing one or more administrative complaints over her RA denials, amending her complaints, and pursuing her claims.

150.)    Defendant retaliated against Plaintiff on account of her protected activities by imposing an unwarranted one-day suspension without pay on Plaintiff on March 30, 2015.

151.)    Defendant took this action despite having abundant evidence that the alleged grounds for the suspension were false.

152.)    Defendant's pretextual suspension of Plaintiff caused her to lose a day's salary; caused injury to her career and professional reputation; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

153.)    By the foregoing actions, defendant took materially adverse action against Plaintiff that would dissuade a reasonable employee from making or supporting a charge of discrimination, opposing unlawful employment practices, or making a request for reasonable accommodation.

## COUNT VII

**(Title VII and/or Rehabilitation Act Reprisal – Issued Unsatisfactory
Performance Appraisal, November 4, 2014)**

154.)   Plaintiff incorporates the allegations contained in paragraphs 1 through 153 above, as though fully set forth here.

155.)   Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3) by filing an EEO complaint of discrimination in September of 2012, and continuously since then by continuing to amend her complaint(s), file new complaints, and pursue her claims.

156.)   Plaintiff engaged in protected activity under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq., by requesting reasonable accommodation in December of 2012, March of 2013, and August of 2014, and by filing, amending, and/or pursuing her administrative complaints.  She also continuously engaged in protected activity between January of 2013 and May of 2015 by filing one or more administrative complaints over her RA denials, amending her complaints, and pursuing her claims.

157.)   Defendant retaliated against Plaintiff on account of her protected activities by issuing her an unwarranted "Unsatisfactory" performance appraisal for Fiscal Year 2014 on November 14, 2014.

158.)   Defendant's basis for rating Plaintiff as "Unsatisfactory" was false and was a pretext to retaliate against Plaintiff.

159.)   Based on her actual performance, and her history of performance with Defendant, Plaintiff should have been rated at the "Outstanding" level.

160.)   At HUD, monetary performance bonuses are directly tied to an employee's performance rating and grade level.  As a result of the "Unsatisfactory" rating, Plaintiff received

31

no monetary performance bonus, which was a significant reduction from what she would have received had she been rated as "Outstanding" or even "Highly Successful."

161.)   Defendant's pretextual issuance to Plaintiff of an "Unsatisfactory" performance rating caused injury to her career and professional reputation; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

162.)   By the foregoing actions, defendant took materially adverse action against Plaintiff that would likely dissuade a reasonable employee from making or supporting a charge of discrimination, opposing unlawful employment practices, or making a request for reasonable accommodation.

## COUNT VIII

### (Title VII and/or Rehabilitation Act Reprisal – Placed on Leave Restrictions, April 29, 2013)

163.)   Plaintiff incorporates the allegations contained in paragraphs 1 through 162 above, as though fully set forth here.

164.)   Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3) by filing an EEO complaint of discrimination in September of 2012, and continuously since then by continuing to amend her complaint(s), file new complaints, and pursue her claims.

165.)   Plaintiff engaged in protected activity under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq., by requesting reasonable accommodation in December of 2012, March of 2013, and August of 2014, and by filing, amending, and/or pursuing her administrative complaints.  She also continuously engaged in protected activity between January

of 2013 and May of 2015 by filing one or more administrative complaints over her RA denials, amending her complaints, and pursuing her claims.

166.)    Defendant retaliated against Plaintiff on account of her protected activities by placing her on leave restrictions on April 29, 2013.

167.)    Defendant's stated reason for placing Plaintiff on leave restrictions was false and was a pretext to retaliate against Plaintiff.  All of Plaintiff's leave had been approved by her supervisor(s), and was taken for legitimate reasons.

168.)    Defendant's placement of Plaintiff on leave restrictions interfered with her ability to receive needed physical therapy and medical treatment; negatively impacted her retirement annuity and annual leave payout upon retirement; and caused her to suffer physical and emotional pain, harm to her professional reputation, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

169.)    By the foregoing actions, Defendant took materially adverse action against Plaintiff that would likely dissuade a reasonable employee from making or supporting a charge of discrimination, opposing unlawful employment practices, or making a request for reasonable accommodation.

## COUNT IX

**(Title VII and/or Rehabilitation Act Reprisal – Rated "Fully Satisfactory" on Annual Performance Appraisal, January 23, 2014)**

170.)    Plaintiff incorporates the allegations contained in paragraphs 1 through 169 above, as though fully set forth here.

171.)     Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-3) by

filing an EEO complaint of discrimination in September of 2012, and continuously since then by continuing to amend her complaint(s), file new complaints, and pursue her claims.

172.)    Plaintiff engaged in protected activity under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 et. seq., by requesting reasonable accommodation in December of 2012, March of 2013, and August of 2014.  She also continuously engaged in protected activity between January of 2013 and May of 2015 by filing one or more administrative complaints over her RA denials, amending her complaints, and pursuing her claims.

173.)    Defendant retaliated against Plaintiff on account of her protected activities by issuing her an unwarranted "Fully Satisfactory" performance appraisal for Fiscal Year 2013 on January 23, 2014.

174.)    Defendant's basis for rating Plaintiff as "Fully Satisfactory" was false and was a pretext to retaliate against Plaintiff.

175.)    Based on her actual performance, and her history of performance, Plaintiff should have been rated at the "Outstanding" level.

176.)    At HUD, monetary performance bonuses are directly tied to an employee's performance rating and grade level.  As a result of the "Fully Satisfactory" rating, Plaintiff received a lower monetary performance bonus than she would have received had she been rated as "Outstanding" or "Highly Successful."

177.)    Defendant's pretextual issuance to Plaintiff of a "Fully Satisfactory" performance rating caused injury to her career and professional reputation; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

178.) By the foregoing actions, defendant took materially adverse action against Plaintiff that would likely dissuade a reasonable employee from making or supporting a charge of discrimination, opposing unlawful employment practices, or making a request for reasonable accommodation.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Elisa J. Yochim, respectfully requests that the Court enter judgment in her favor and award her the following relief:

A.     An Order declaring that defendant violated Plaintiff's civil rights under Title VII of the Civil Rights Act, as amended, 42 U.S.C. §2000e-16, and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791 et seq.

B.     Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of professional reputation, loss of enjoyment of life, and detrimental impact on her health caused by Defendant's unlawful actions.

C.     The difference between the monetary performance bonus Plaintiff received for FY 2013 and FY 2014 and what she would have received had she been rated as "Outstanding" for both of those years.

D.     Equitable relief for the paid leave that Plaintiff was forced to use as a result of Defendant's unlawful denial of her RA requests, and for the religious comp time that she had to "repay" upon her retirement.  Plaintiff also seeks retroactive adjustment of her retirement annuity to the level at which it would have been had Defendant not improperly caused her to use significant amounts of sick leave before retiring.

E.     Record correction.

F.      The attorneys' fees and costs incurred by plaintiff.

G.      Such other relief as may be just and appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all issues so triable.


RESPECTFULLY SUBMITTED,

By:    /s/ Michael I. Leonard
        Counsel for Plaintiff


**LEONARD MEYER, LLP**
Michael I. Leonard
John P. Killacky
Ethan E. White
120 N. LaSalle Dr., Suite 2000
Chicago, Illinois 60602
(312) 374-8084 (telephone)
(312) 264-0671 (fax)


By:    /s/ Robert C. Seldon
        Counsel for Plaintiff
        (moving for *pro hac vice* admission)


**SELDON BOFINGER, PC**
Robert C. Seldon (moving for *pro hac vice* admission)
Molly E. Buie (moving for *pro hac vice* admission)
1319 F Street, NW, Suite 200
Washington, D.C. 20004
(202) 841-5038 (telephone)
(202) 318-2287 (fax)